**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**AMY SUE HINKLE,**

     **Plaintiff,**

**v.**                                     **Civil Action No. 2:17-cv-02807**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Memorandum in Support of Judgement on the Pleadings (ECF No. 10) and Defendant's Brief in Support of Defendant's Decision (ECF No. 11). This is an action seeking remand of the decision of the Commissioner of Social Security denying Claimant's application for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act for further explanation.

### Background

Claimant, Amy Sue Hinkle, filed applications for DIB and SSI on November 7, 2013. Claimant alleged disability beginning January 16, 2008. The claims were denied initially on February 26, 2014, and upon reconsideration on May 1, 2014. On June 4, 2014, Claimant filed a request for hearing before an Administrative Law Judge. A video hearing was held on October 8, 2015. Claimant appeared in person before the Administrative Law Judge at the hearing in Charleston, West Virginia. The Administrative Law Judge (ALJ) denied Claimant's applications on October 30, 2015. On approximately November 17, 2015, Claimant requested review of the ALJ's decision with the Appeals Council. On March 13, 2017, the Appeals Council (AC) denied

Claimant's request for review. On May 9, 2017, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g) (ECF No. 2).

<u>Standard of Review</u>

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520 and 416.920 (2017). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a) and 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b) and 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c) and 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d) and 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e) and 416.920(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f) and 416.920(f)

2

(2017). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520(a) and 416.920(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520(c) and 416.920(c). Those sections provide as follows:

*(c) Rating the degree of functional limitation.*

(1)    Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2)    We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See

12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3)     We have identified four broad functional areas in which we will rate the degree of your functional limitation:

Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4)     When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520(d)(1) and 416.920(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520(d)(2) and 416.920(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental

4

disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(d)(3) and 416.920(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section. 20 C.F.R. §§ 404.1520(e)(2) and 416.920(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since November 22, 2013 (Tr. at 13). Claimant met the insured status requirements of the Social Security Act through June 30, 2017. (*Id.*) Under the second inquiry, the ALJ found that Claimant suffers from the following severe impairments: bipolar disorder and generalized anxiety disorder (Tr. at 14). At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1. (*Id.*) The ALJ then found that Claimant has a residual functional capacity to perform a full range of work at all exertional levels (Tr. at 16). Claimant must have no exposure to unprotected heights. She can never operate a motor vehicle. Claimant is limited to performing simple routine tasks. She is limited to simple work related decisions. Claimant must have no contact with the public. (*Id.*) The ALJ found that Claimant is capable of performing past relevant work as a biscuit maker/ preparation. This work does not require the performance of work-related activities precluded by Claimant's residual

functional capacity (RFC) (Tr. at 20). On this basis, Claimant's application was denied (Tr. at 21-22).

## Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A further review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

## Claimant's Background

Claimant was born on August 1, 1973. She last completed the 11th grade. She lives with her daughter. Claimant does not have a driver's license.

## The Medical Record

The medical record has been adopted, as set forth in the Claimant's Brief, Defendant's Brief and the ALJ's decision, to the extent as follows:

Claimant had a history of two short hospital admissions at Charleston Area Medical Center (CAMC) in January and May 2013 for suicidal ideation and ingestion of prescription medications. Both hospitalizations occurred before Claimant's alleged November 22, 2013, onset date of disability, at which time she was working full-time (Tr. at 207, 214-216).

During this period, Claimant also underwent mental health treatment at Cabin Creek Health Systems/Clendenin Health Center in Clendenin, West Virginia. On April 22, 2013, Claimant saw Marilou Patalinjug, M.D., and reported feeling better but still had periods of depression and anger triggered by her husband (Tr. at 456). Following her hospitalization, on May 30, 2013, Claimant saw Beverly Wheatcraft, M.S.W., L.I.C.S.W., and indicated that she would not attempt suicide again for fear of leaving her children (Tr. at 449). Claimant focused on making a quilt for her son and planting flowers as a form of stress management (Tr. at 452). On June 17, 2013, Claimant reported stress due to her husband's return and a conflict with a coworker (Tr. at 447). On June 27, 2013, she stated to Ms. Wheatcraft that she was tired of supporting her husband financially (Tr. at 445).

On July 8, 2013, Ms. Wheatcraft noted Claimant's mood was much better, she reported feeling better, was planning to visit a friend in Ohio and was "relieved" and happy to leave town for a while (Tr. at 443). Claimant reported to Ms. Wheatcraft on July 30, 2013, that she continued to feel better and finally asked her husband for a divorce (Tr. at 438). She was "stronger emotionally," more confident, maintained eye contact, and was a little depressed, but mostly relieved. (*Id.*) She had focused stream of thought, relevant thought content and normal cognitive functioning. (*Id.*) She stated she was still working at Tudors and her job was better as there was more help available (Tr. at 438). On August 9, 2013, Anne Berry, M.D., noted that Claimant was seeing Dr. Patalinjug at the facility and doing well (Tr. at 436).

On August 26, 2013, Claimant reported to Dr. Patalinjug that she got into a fight with the woman her husband was staying with and reported depression, difficulty concentrating at work, and poor motivation (Tr. at 434). However, on examination, she was cooperative and calm, had good eye contact, coherent, goal directed stream of thought, relevant thought content, stable cognitive functioning, but dysphoric mood and blunted affect. (*Id.*)

Claimant saw Dr. Patalinjug on November 4, 2013, and reported having good days and bad days (Tr. at 473). She indicated that her medication helped, but she had periods of anxiety and aggravation at work and noted that she was given more responsibility to manage co-workers but they did not listen, and that she did not receive a promised pay raise. Claimant reported feeling sad, having disrupted sleep and decreased appetite, depressed mood, decreased attention/concentration, decreased activity, energy, motivation, and drive and more, anxiety. Dr. Patalinjug continued her medications and noted that her father suggested that she quit her job (Tr. at 473-474).

Claimant treated with Kathleen Lovin, PA-C, of Cabin Creek Health Systems/Clendenin Health Center on December 2, 2013 (Tr. at 471). At that time, Claimant had good judgment, normal mood and affect and was active and alert (Tr. at 489). Claimant reported working as the head cook at Tudors (Tr. at 470). On December 27, 2013, Claimant saw Jessica McColley, D.O. (Tr. at 489). Dr. McColley noted that Claimant had good judgment and normal recent and remote memory (Tr. at 490). Her reported employment status had not changed. (*Id.*) She returned to Dr. McColley on January 17, 2014, and Dr. McColley stated she again had good judgment, normal recent and remote memory and reported working as the head cook at Tudors (Tr. at 487).

On February 26, 2014, Frank Roman, Ed.D., state agency psychological consultant, reviewed the record and opined that Claimant had mild restriction of activities of daily living,

moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace and no repeated episodes of decompensation, each of extended duration (Tr. at 69, 77). He opined that Claimant retained the capacity for simple, routine, repetitive tasks in a low pressure setting with minimal changes in routine, little decision making, no fast production and no supervisory duties (Tr. at 72, 79). She could perform work at the semiskilled level. (*Id.*) Social interaction should be minimal and in a small group setting, and she would need occasional rest breaks throughout the day and a work setting with few distractions. (*Id.*) She could respond to periodic supportive supervision. (*Id.*) Chester Frethiem, Psy.D., affirmed Dr. Roman's assessment on April 30, 2014 (Tr. at 88, 90). The ALJ gave the opinions of Dr. Roman and Dr. Frethiem little weight "as the State agency evaluated the claimant beginning January 16, 2008," which was Claimant's original alleged onset date. At the hearing, Claimant amended her alleged onset date to November 22, 2013. The ALJ found that the mental health treatment notes since Claimant's amended onset date, as well as the numerous activities of daily living, include the ability to perform at least part-time work. Therefore, the ALJ found that "There is no basis in the record, particularly since November 22, 2013, that the claimant would need occasional rest breaks, thus this opinion is given no weight" (Tr. at 19).

On April 14, 2014, Claimant saw Anne Berry, M.D. (Tr. at 552). She reported normal sleep patterns, getting up at 5:30 a.m. when her children get up for school and going to sleep around 8:00 p.m. or 9:00 p.m. (Tr. at 553). Claimant reported normal exercise habits and no new stressors in life, although, she did complain that recently her depression was worse. (*Id.*) Dr. Berry noted a mildly depressed affect, but normal attention and concentration. (*Id.*) Although Claimant complained of recent fatigue, Dr. Berry explained that it could be depression or mild dehydration and advised her to drink more fluids (Tr. at 554). Dr. Berry also advised her to

maintain a regular work schedule as a lack of daily routine can worsen depression symptoms for some people. (*Id.*) Claimant responded that her past psychiatrist advised her not to work at all. (*Id.*)

On May 12, 2014, Claimant was seen at Saint Francis Hospital in Charleston, West Virginia, because the top of her head hurt (Tr. at 620). Her psychiatric exam was rather flat (Tr. at 620, 626). She left prior to a CT scan, stating that she needed to catch a bus and wanted a work excuse (Tr. at 627).

On October 1, 2014, Claimant returned to Saint Francis Emergency Room complaining of epigastric pain (Tr. at 659). An examination revealed a normal mood and affect and she was cooperative (Tr. at 664, 679, 683). She denied anxiety, anhedonia, apathy, depression, hallucinations, homicidal ideation, insomnia, panic attacks, suicidal ideation or tearfulness (Tr. at 678).

On March 4, 2015, Claimant saw Emily Strickland, PA-C, at Cabin Creek Health Systems/Clendenin Health Center (Tr. at 584). Ms. Strickland noted that she had good judgment, was active and alert and was oriented to time, place and person with normal recent and remote memory (Tr. at 585). Philip Reustle, PA-C, noted a few weeks later that Claimant was oriented to time, place and person (Tr. at 582).

Claimant reported to the Emergency Room at Saint Francis Hospital on May 15, 2015, for complaints of chest pain (Tr. at 727). The Emergency Room record reflects that Claimant was moderately distressed and crying (Tr. at 733). Her psych was "normal" with an appropriate mood and affect. (*Id.*)

Claimant saw Letitia Tierney, M.D., on June 29, 2015, for a follow up for shingles (Tr. at 751). She had no acute complaints. (*Id.*) She had good judgment, normal mood and affect and

was active and alert (Tr. at 752). She "reports no depression" and no fatigue. (*Id.*) She was cleared to return to work and to work around food (Tr. at 753).

Claimant returned for treatment with Ms. Lovin on September 8, 2015, and was reported that she had good judgment (Tr. at 748). Before the hearing on September 24, 2015, Claimant underwent an evaluation with Tony Goudy, Ph.D. at the direction of her counsel (Tr. at 756-763). Dr. Goudy extensively noted Claimant's subjective complaints, including feelings of nervousness, hyperactivity, vigilance and scanning (Tr. at 757). On examination, Claimant appeared somewhat lethargic and reserved with poor eye contact, though she tried to cooperative fully (Tr. at 759). Claimant reported she was a "little anxious" when asked to describe her mood. (*Id.*) Her affect was observed as blunted. (*Id.*) Claimant's speech and communication was invariably relevant and coherent, though she did not engage in spontaneous conversation. (*Id.*) She denied any current intent or plan to harm herself and further denied perceptual disturbances (Tr. at 760). She was oriented to time, place, person and circumstances, but she did not know the date. (*Id.*)

Dr. Goudy indicated that Claimant had intact immediate memory and mildly impaired recent memory based on her ability to recall four objects (Tr. at 760). She was an adequate historian and it was believed her remote memory was not significantly impaired. (*Id.*) Dr. Goudy believed that claimant was markedly impaired in concentration due to her difficulty with serial threes and serial sevens. (*Id.*) Dr. Goudy also administered the Beck Depression Inventory-II (BDI-II) and Beck Anxiety Inventory, (BAI), which are based on a patient's self-reported symptoms. (*Id.*) Based on these scores, Dr. Goudy indicated that Claimant had severe depression and moderate anxiety. (*Id.*)

11

Dr. Goudy opined that Claimant had a mild impairment in activities of daily living, mild-to-moderate impairment in social functioning, marked impairment in concentration, persistence or pace and two episodes of decompensation (Tr. at 761). Dr. Goudy diagnosed Claimant with bipolar I disorder, most recent episode depressed, severe without psychotic features as well as generalized anxiety disorder. (*Id.*)

In a checkbox opinion, Dr. Goudy indicated that Claimant had a number of limitations, including marked limitations in using judgment; dealing with work stresses; functioning independently; maintaining attention/concentration; understanding, remembering, and carrying out complex job instructions; behaving in an emotional stable manner; and completing a normal work week and day without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods (Tr. at 765).

The ALJ assigned "little weight" to Dr. Goudy's opinion because Dr. Goudy's opinion was given during a one-time evaluation arranged by Claimant's representative. Additionally, the ALJ found that "There is no basis in the record supportive of the marked or even moderate limitations as defined by Dr. Goudy" (Tr. at 19). Furthermore, the ALJ stated that "The claimant's ability to perform the part-time work as identified, as well as her extensive activities as discussed above, reflects a higher functioning level than the severity of limitations listed by Dr. Goudy." (*Id.*) The ALJ found that although Dr. Goudy referred to Claimant as having two hospitalizations, there is no evidence of a mental health admission as of the amended onset date of November 22, 2013.

## Claimant's Testimony

Claimant testified that she lives with her 16-year old daughter (Tr. at 36). She has never had a driver's license and when asked how she got to the hearing, she stated she rode a bus (Tr. at 36). She can go out alone (Tr. at 248). Claimant reported that she has no problem taking care

of her personal hygiene (Tr. at 46, 246). She cooks and does laundry for her children, takes care of her four dogs, visits her parents occasionally, talks and texts with friends daily, prepares meals daily, shops once per month, handles her own finances and does laundry and cleaning "everyday, all day" without encouragement (Tr. at 47, 247-49, 270). However, three months after her first function report, she indicated that she was more limited, and only makes meals monthly and cleans once per week (Tr. at 269). She stated likes to sew (Tr. at 249, 271). Claimant alleged issues with concentration, despite these activities (Tr. at 50-51, 250, 272). In one function report, she indicated that she can only pay attention for a "few seconds" (Tr. at 272). She indicated that she does not follow written instructions and does not follow spoken instructions very well (Tr. at 250, 272). She testified she has problems sleeping and does not handle stress well (Tr. at 49, 251, 273). She felt that if she worked more hours, she would miss work frequently (Tr. at 50).

<u>Vocational Expert Testimony</u>

William Tanzey, a vocational expert (VE) testified at Claimant's disability hearing (Tr. at 53-61). He classified Claimant's past work as a biscuit preparer, DOT 313.374-014, performed at the light level with a specific vocational preparation (SVP) of 2 (Tr. at 53-54). The ALJ provided a hypothetical question where an individual of Claimant's age, education and vocational experience could perform a full range of work at all exertional levels, but could never operate a motor vehicle; was limited to performing simple routine tasks and simple work related decisions; and could have no contact with the public (Tr. at 54). The VE testified that such an individual could perform her past work and also other jobs such as laundry worker (medium), hand packer (medium), price marker (light), product inspector (light), grader/sorter (sedentary) and simple hand assembly (sedentary) (Tr. at 55-56).

Claimant's counsel then asked the VE different hypothetical questions, including one where an individual retains the capacity for simple, routine, repetitive tasks in a low-pressure setting with minimal changes in routine and little decision making; no production pace work setting; no supervisor duties recommended; social interactions should be minimal and in a small group setting; with occasional rest breaks (defined by counsel as breaks for 1/3 to 2/3 of the workday); a work setting with few distractions; and could respond to periodic supportive supervision (Tr. at 58). The VE testified that if "occasional" rest breaks were defined as 1/3 of the  day, no jobs would exist (Tr. at 59). He testified that the hypothetical "sounded" like supported  employment, which was sheltered work (Tr. at 59).

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant argues that the ALJ failed to comply with 20 §§ CFR 404.1527 and 416.927 in evaluating the medical opinions of record (ECF No. 10).   Claimant asserts that the ALJ failed to consider Claimant's part-time employment as sheltered or accommodated.  (*Id.*)  In response, Defendant asserts that substantial evidence supports the weight the ALJ gave the medical source opinion evidence "in fashioning an RFC assessment" which accounted for all of the credibly-established functional limitations resulting from Claimant's mental impairments (ECF No. 11). Defendant avers that controlling regulations empower the ALJ, not a physician, to assess a Claimant's RFC.  Defendant asserts that the ALJ is not required to base the RFC on a specific medical opinion, but may base the assessment on the record as a whole.  (*Id.*)  Defendant asserts that the ALJ appropriately afforded the opinions of Dr. Goudy, a one time examiner, "little weight" because his opinions were inconsistent with and unsupported by the evidence.  Defendant avers that Dr. Goudy's opinions were inconsistent with Claimant's stable mental health findings reflected in the evidence of record, her daily activities and the fact that she performed part-time

work.  (*Id.*)  Defendant avers that the ALJ appropriately discounted the state agency psychological consultants' opinions as they focused on the evidence beginning in January 2008, instead of the amended onset date, and were inconsistent with the recent mental health notes and extensive activities of daily living.  Defendant asserts that substantial evidence supports the ALJ's consideration of Claimant's part-time work as a biscuit maker where there was no evidence that it was "sheltered" work as defined by the agency.

## Discussion

The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on  a person's ability to function in the workplace.  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 04.1505(a); *see Heckler v. Campbell*, 461 U.S. 458, 459-60 (1983); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[An impairment] is not necessarily disabling.  There must be a  showing of related functional loss.").  The responsibility for determining whether Claimant is  disabled resides with the Commissioner.  20 C.F.R. § 404.1527(e)(1).  To be eligible for disability benefits, Claimant bears the burden of showing not only that she has a medically determinable impairment, but that it is so severe that it prevents him from engaging in her past relevant work or any other substantial gainful activity that exists in the national economy for a 12-month period.  42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

## Weight Afforded Medical Opinions

Social Security Ruling 96-6p provides that findings of fact made by state agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources at the ALJ and Appeals Council levels of administrative review. ALJs and the Appeals Council may not ignore these opinions and must explain the weight given to these

15

opinions in their decisions.

As explained by SSR 96-6p, the regulations provide "progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." For example, SSR 96-6p states that opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.

Thus, SSR 96-6p concludes that the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as (1) the supportability of the opinion in light of the evidence in the record; (2) consistency with the record, including other medical opinions; (3) and any explanation for the opinion. *Id.*

Social Security Ruling 96-7p confirms that ALJs and the Appeals Council are required to consider findings of fact by state agency medical and psychological consultants and other program physicians and psychologists about the existence and severity of an individual's impairment(s), including the existence and severity of any symptoms. *See* 65 Fed. Reg. 11,866 (Mar. 7, 2000). While ALJs and the Appeals Council are not bound by any state agency findings, they may not ignore these opinions and must explain the weight they give to the opinions in their decisions. *Id.*

Further, "[u]nless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, non-treating sources, and other non-examining sources who do not work for us." (*Id.*)  Examples of the kinds of factors that

an administrative law judge must consider when evaluating the findings of State agency medical and psychological consultants are provided in paragraph (c)[1] of §§ 404.1527 and 416.927.

RFC

Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication. *Id.* at \*5. Social Security Ruling 96-8p explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Monroe v. Colvin,* 826 F.3d 176, 179-80. (4th Cir. 2016). (citing *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting SSR 96-8p, 61 Fed. Reg. at 34, 478; see also *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

An RFC refers to the most a claimant can still do despite her limitations and is an assessment that is based upon all of the relevant evidence, including descriptions of limitations. 20 C.F.R. §§ 416.945(a), 404.1545. The Fourth Circuit has held that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

---

[1] Unless a treating source's opinion is given controlling weight, all of the following factors will be considered in deciding the weight given to any medical opinion: (1) Examining relationship; (2) Treatment relationship; (3) Supportability; (4) Consistency; (5) Specialization; and (6) Other factors. 20 C.F.R. 416.927(c) and 404.1527.

17

The final responsibility for determining a claimant's RFC is reserved to the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §§ 416. 927(d)(2), (3), 404.1527. For cases at the hearing level, the responsibility for determining a claimant's RFC rests with the ALJ. 20 C.F.R. §§ 416.946, 404.1546. Therefore, an ALJ clearly has the duty and authority to make an independent assessment of a claimant's RFC based on the evidence of record.

Consistent with the regulations, the Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but may base the assessment on the record as a whole including subjective complaints, objective medical evidence, and medical source opinion evidence. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230-31 (4th Cir. 2011). *See also Hampton v. Colvin*, No. 1:14-cv-24505, 2015 WL 5304294, at *28 (S.D.W. Va. Aug. 17, 2015), *adopted by* 2015 WL 5304292 (S.D.W. Va. Sept. 9, 2015) (no requirement in the regulations for direct correspondence between ALJ's RFC finding and specific medical opinion).

In the present case, the ALJ did not commit error in assessing Claimant's RFC by declining to adopt the opinions of Dr. Goudy, a one time examiner, and state agency medical consultants Drs. Roman and Dr. Frethiem. Rather, the ALJ, consistent with the regulations, considered all of the medical and other evidence, in assigning these opinions weight. Because they were inconsistent with the record, the ALJ declined to include their limitations in the RFC. "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

In the present matter, the ALJ discussed that the limitations limitations assessed by Dr. Goudy were inconsistent with the Claimant's mental health conditions after the amended alleged onset date on November 22, 2013, and after she began taking medication (Tr. at 19). 20

C.F.R. §§ 404.1527(c)(3), (4), 416.927(c)(3), (4) (ALJ will consider the supportability and consistency of the opinion with the record as a whole). The ALJ discussed Claimant's treatment at Cabin Creek Health Systems/Clendenin Health Center that revealed that Claimant was active and alert, had good judgment, was fully oriented, displayed normal mood and affect, and had normal recent and remote memory (Tr. at 17-18, 487, 489-90, 582, 585, 748, 752). When Claimant saw Dr. Berry in April 2014, she reported normal sleep patterns and waking up when her children got up for school (Tr. at 17, 553). She had normal exercise habits and no new stressors in her life (Tr. at 553). Her affect was only "mildly" depressed, and she displayed normal attention and concentration (Tr. at 17-18, 553). Dr. Berry advised Claimant to maintain a regular work schedule as a lack of daily routine can worsen depression symptoms for some people (Tr. at 18, 554). Furthermore, while Dr. Goudy referred to Claimant as having two hospitalizations, there was no evidence of a mental health admission as of the amended onset date of November 22, 2013 (Tr. at 19, 758). Although Dr. Goudy relied on the Beck Depression and Anxiety Inventories in making these assessments, the ALJ correctly noted that these scores were based on self-reported symptoms, and thus were not objective findings of depression or anxiety (Tr. at 18, 760).

Additionally, the ALJ noted Claimant's extensive activities during the relevant period that conflicted with Dr. Goudy's extreme limitations (Tr. at 18, 19). 20 C.F.R. §§ 404.1527(c)(3), (4), 416.927(c)(3), (4). For example, Plaintiff reported that she cooked, cleaned, and did laundry for her children (Tr. 18, 247). She fed and watered pets (Tr. 18, 246). She had no problems with personal care (Tr. 18, 46, 246). She prepared meals daily (Tr. 18, 247). She could go out alone and use public transportation, and went shopping all day once per month (Tr. 18, 248). She could pay bills and use a checkbook (Tr. 18, 248). Her hobby was

sewing, which she reported doing daily (Tr. 18, 249). She also reported talking on the phone or texting friends daily, as well as visiting her parents occasionally (Tr. 17-18, 47, 249). These extensive activities constituted an acceptable reason for the ALJ to discount Dr. Goudy's opinion. *See Fouch v. Colvin*, No. 2:12-CV-00659, 2013 WL 1221909, at *7 (S.D. W. Va. Mar. 25, 2013) (ALJ appropriately discounted physician opinion in part, based on her reported daily activities); *Webb v. Astrue*, No. 2:11–CV–00103, 2012 WL 3061522, at *13 (N.D.W. Va. July 26, 2012) ("This Court agrees that these daily activities are directly inconsistent with [a physician's] opinion").

In the present case, the ALJ appropriately considered that, while Claimant was not working at the substantial gainful level, she worked an early shift as a biscuit maker up to four days per week, working up to six hours per day (Tr. at 18, 39-40). She acknowledged performing the same work as she previously had full-time. (*Id.*) The performance of Claimant's part-time work was an appropriate basis to discount a medical source opinion. *Kennerly v. Colvin*, No. 2:15-CV-01540, 2015 WL 9672913, at *11 (S.D.W. Va. Dec. 8, 2015), *adopted by* 2016 WL 93867 based on claimant's work activity); *McFarland v. Barnhart*, No. 204CV00097, 2005 WL 1594255, at * 6 (W.D. Va. July 6, 2005) (substantial evidence supported an ALJ's decision to discount a physician opinion where claimant "was currently working two hours per day").

In the present matter, the ALJ reviewed the medical and other evidence in evaluating Dr. Goudy's opinion. Because substantial evidence supports his determination that Dr. Goudy's opinion was inconsistent and unsupported by the medical evidence, he was not required to include such limitations in the RFC.

Additionally, the ALJ appropriately evaluated the opinions of the state agency psychological consultants in evaluating Claimant's RFC (Tr. at 19). Substantial evidence

supported his decision to afford portions of Dr. Roman's opinion, which was affirmed by Dr. Frethiem, "little weight," as the opined limitations were unsupported by the medical and other evidence of record (Tr. at 19, 72, 79). Additionally, the ALJ decided to afford "no weight" to the limitation that Claimant would need occasional rest breaks because the limitation was not supported in the record (Tr. at 19, 72, 79).

The ALJ noted that Dr. Roman and Dr. Frethiem reviewed the record in making their assessment. 20 C.F.R. §§ 404.1527(c)(1), (2) 416.927(c)(1), (2). The ALJ discussed that these opinions were rendered with an eye towards January 16, 2008, Claimant's original alleged onset date of disability (Tr. at 19, 66, 74, 84, 190-97). However, as noted by the ALJ, Claimant later amended her onset date to November 22, 2013 (Tr. at 19, 207). Thus, the ALJ appropriately discounted the opinion, as Dr. Roman and Dr. Frethiem considered a different period than the one at issue here, beginning in November 2013 (Tr. at 19). *See, e.g*., 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) (ALJ may consider other factors which tend to support or contradict the opinion).

Furthermore, the ALJ discounted the opinions of Dr. Roman and Dr. Freithem because they were inconsistent with the medical and other evidence of record, including the mental health treatment notes since the amended onset date of disability (Tr. at 19). 20 C.F.R. §§ 404.1527(c)(3), (4), 416.927(c)(3), (4). The treatment notes revealed that Claimant was active and alert, had good judgment, was fully oriented, displayed normal mood and affect, had normal recent and remote memory, and normal concentration and attention (Tr. at 17-18, 487, 489-90, 553, 582, 585, 748, 752). More so, Claimant was able to perform an extensive number of daily activities, including working up to six hours per day, four days per week (Tr. at 19, 40).

The ALJ determined that there was no basis in the record supporting the need for occasional rest breaks, and was not required to adopt the other limitations assessed by Dr. Roman and Dr. Frethiem. Consistent with the regulations, the ALJ assessed the RFC following a review of the entire record. *Felton-Miller*, 459 F. App'x at 230-31.

Claimant asserts that the ALJ erred in considering her part-time employment as a biscuit-maker because it was "sheltered" work (ECF No. 10). However, SSR 83-33 specifically defines sheltered work as "employment provided for handicapped individuals in a protected environment under an institutional program." SSR 83-33, 1983 WL 31255, at *7; *see also* 20 C.F.R. §§ 404.1574, 416.974. There is no evidence in the record, and Plaintiff has cited to none, that her work at Tudor's Biscuit World met this definition. *Green v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 906, 908 (11th Cir. 2014) (claimant's work at the county clerk office did not constitute sheltered work, as "sheltered work" entails a specific definition under Agency rules and regulations).

Additionally, Claimant argues that her earnings were "subsidized," but she has failed in her burden of proof in this regard as well. While Claimant asserts that her employer had a "benevolent attitude," there is no evidence that Tudor Biscuit World "subsidize[d] the employee's earnings by paying more in wages than the reasonable value of the actual services performed." SSR 83-33, 1983 WL 31255, at *3; *Martin v. Astrue*, No. CIV-11-845-R, 2012 WL 1795190, at *4 (W.D. Okla. Apr. 24, 2012), *adopted by* 2012 WL 1795188 (W.D. Okla. May 16, 2012) (where claimant presented no evidence beyond testimony that her supervisor checks her work, claimant failed in her burden of proving her work was subsidized).

Claimant asserted that her part-time work required "constant supervision, task assistance, and additional breaks" (ECF No. 10), thus making it "sheltered" or "subsidized"

work, was not supported by the record. Rather, Claimant testified that she was currently performing the same duties as when she worked full-time (Tr. at 17, 39). There was no evidence that Claimant required "constant supervision" (Tr. at 48). Although Claimant stated that it "seems like I'm taking more breaks than the others when my mind starts a-wandering off," there is no evidence that she actually was provided any extra employer-permitted breaks (Tr. at 48).

The ALJ found that claimant's part-time work was inconsistent with her asserted limitations (Tr. at 18). The ALJ also noted that Claimant's part-time work demonstrated that her alleged symptoms do not interfere with her ability to perform the work activity of a biscuit maker. (Tr. at 16-20). *See e.g., Nelson v. Berryhill*, No. 5:15-CV-00085, 2017 WL 1234065, at *6 (W.D. Va. Mar. 31, 2017) (ALJ properly considered claimant's part-time work, between 15 and 35 hours per week, in finding she was able to do more than she claimed).

To the extent Claimant cites to the VE's response to the hypothetical question requiring "occasional rest breaks" in support of her position that she performed sheltered work, that argument is unpersuasive. The Fourth Circuit has held that "[b]y presenting a hypothetical, the ALJ was not making findings of fact." *Davis v. Apfel*, 162 F.3d 1154, 1998 WL 559728, at *2 (4th Cir. 1998) (table). The mere presentation of this hypothetical by counsel does not support Plaintiff's position that her work was sheltered – indeed, the ALJ specifically declined to find that Plaintiff required occasional rest breaks, noting that the limitation was not supported by the record (Tr. at 19). As such, substantial evidence therefore supports the ALJ's review of Claimant's part-time work.

<u>Conclusion</u>

"Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the

correct legal standard." *Id.* (alterations in original) (internal quotation marks omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted). It "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996). "In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005). (alteration in original) (internal quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (alteration in original) (internal quotation marks omitted).

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 10) to the extent Plaintiff seeks remand pursuant to sentence four of 42 U.S.C. § 405(g), **GRANT** the Defendant's Brief in Support of Defendant's Decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and

24

Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Faber and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter: August 31, 2018

Dwane L. Tinsley
United States Magistrate Judge